Slip Op. 16-63

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **DAVIS WIRE CORP. AND INSTEEL WIRE PRODUCTS COMPANY,** |
| Plaintiffs, |
| v. |
| **UNITED STATES,** |
| Defendant, |
| and |
| **THE SIAM INDUSTRIAL WIRE CO., LTD.,** |
| Defendant-Intervenor. |

**Before: Timothy C. Stanceu, Chief Judge**

**Court No. 14-00131**

## <u>OPINION AND ORDER</u>

[Affirming in part, and remanding in part, a negative less-than-fair-value determination in an antidumping duty investigation]

Dated: June 28, 2016

*Kathleen W. Cannon* of Kelley Drye & Warren LLP, of Washington DC, argued for plaintiffs Davis Wire Corporation and Insteel Wire Products Company. With her on the brief were *David C. Smith, Jr.*, and *R. Alan Luberda*.

*Carrie A. Dunsmore*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States. With her on the brief were *Joyce M. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Whitney M. Rolig*, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Edward M. Lebow* of Haynes & Boone LLP, of Washington DC, argued for defendant-intervenor The Siam Industrial Wire Co., Ltd.

Stanceu, Chief Judge: Plaintiffs Davis Wire Corp. and Insteel Wire Products Company

contest a negative less-than-fair-value determination ("Final Determination") that the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") issued to conclude an antidumping duty investigation of prestressed concrete

steel rail tie wire ("PC tie wire") from Thailand.  *Final Determination of Sales at Not Less than*

*Fair Value: Prestressed Concrete Steel Rail Tie Wire from Thailand*, 79 Fed. Reg. 25,574 (Int'l

Trade Admin. May 5, 2014) ("*Final Determination*").  In the Final Determination, Commerce

calculated a 0.00% weighted-average dumping margin for Siam Industrial Wire Company, Ltd.

("SIW"), a Thai producer and exporter of PC tie wire.  Because SIW was the sole company

investigated, Commerce terminated the investigation without issuing an antidumping duty order.

SIW is the defendant-intervenor in this action.  Plaintiffs are U.S. producers of PC tie wire and

were the petitioners in the investigation.

Plaintiffs challenge three aspects of the Department's determination of normal value in

the Final Determination: (1) the Department's selection of South Africa as a viable comparison

market; (2) the Department's exclusion of certain quantities of a material, wire rod, from its

calculation of SIW's cost of production ("COP"); and (3) the Department's calculation of a

general and administrative ("G&A") expense ratio for SIW.  Compl. ¶¶ 9-16 (June 26, 2014),

ECF No. 9.

Before the court is plaintiffs' motion for judgment upon the agency record pursuant to

USCIT Rule 56.2.  Mot. for J. on Agency R. 56.2 (Oct. 17, 2014), ECF No. 23 ("Pls.' Mot.").

Also before the court is a request by defendant United States that the Final Determination be

remanded in part to allow Commerce to reconsider its exclusion from its calculation of SIW's

cost of production certain wire rod inputs that SIW's PC tie wire division procured internally

from another of SIW's divisions.  Resp. to Pls.' Mot. for J. on the Admin. R. (Jan. 16, 2015),

ECF No. 34 (public), ECF No. 33 (conf.) ("Def.'s Resp.").  The court grants defendant's request,

and it also remands the Final Determination for reconsideration of the Department's calculation

of the G&A ratio.  The court declines to order relief on plaintiffs' remaining challenges.

## I. BACKGROUND

### A.  The Department's Antidumping Duty Investigation

In response to petitions filed by Davis Wire and Insteel Wire, Commerce initiated the

antidumping duty investigation in May 2013 to examine imports of certain PC tie wire from

Thailand entered during the period of April 1, 2012 through March 31, 2013 ("period of

investigation" or "POI").[1]  *Prestressed Concrete Steel Rail Tie Wire From Mexico, the People's*

*Republic of China, and Thailand: Initiation of Antidumping Duty Investigations*, 78 Fed. Reg.

29,325, 29,325 (Int'l Trade Admin. May 20, 2013).

In late 2013, Commerce issued a negative preliminary determination ("Preliminary

Determination") upon finding that U.S. sales of the merchandise under consideration had not

been, and were not likely to be, made at less than fair value.[2]  *Prestressed Concrete Steel Rail Tie*

*Wire From Thailand: Preliminary Determination of Sales at Not Less Than Fair Value and*

*Postponement of Final Determination*, 78 Fed. Reg. 75,547 (Int'l Trade Admin. Dec. 12, 2013)

---

[1] For purposes of the antidumping duty investigation, Commerce defined "prestressed concrete steel rail tie wire" ("PC tie wire") as "high carbon steel wire; stress relieved or low relaxation; indented or otherwise deformed; meeting at a minimum the physical, mechanical, and chemical requirements of the American Society of Testing Materials (ASTM) A881/A881M specification; regardless of shape, size, or alloy element levels; suitable for use as prestressed tendons in concrete railroad ties (PC tie wire)."  *Final Determination of Sales at Not Less than Fair Value: Prestressed Concrete Steel Rail Tie Wire from Thailand*, 79 Fed. Reg. 25,574, 25,575 (Int'l Trade Admin. May 5, 2014).

[2] On June 20, 2013, the U.S. International Trade Commission preliminarily determined that there was a reasonable indication that an industry in the United States is materially injured by reason of imports of PC tie wire from Thailand.  *Prestressed Concrete Steel Rail Tie Wire From China, Mexico, and Thailand*, 78 Fed. Reg. 37,236 (Int'l Trade Comm'n June 20, 2013).

("*Prelim. Determination*"); *Decision Mem. for the Prelim. Determination in the Antidumping*

*Duty Investigation of Prestressed Concrete Steel Tie Wire from Thailand*, A-549-829 (Dec. 5,

2013) (P.R. Doc. 119), *available at* http://enforcement.trade.gov/frn/summary/thailand/2013-

29692-1.pdf (last visited June 23, 2016) ("*Prelim. Decision Mem.*").  To determine whether U.S.

sales of PC tie wire from Thailand were made at less than fair value, Commerce compared POI

weighted-average constructed export price to POI weighted-average normal value (average-to-

average methodology).  *Prelim. Decision Mem.* 7; *see* 19 C.F.R. § 351.414(b)(1) (describing the

"average-to-average method" of comparing home market and U.S. sales), *and id.* § 351.414(c)(1)

("In an investigation, the Secretary normally will use the average-to-average method.").[3]  Basing

SIW's POI weighted-average normal value on constructed value,[4] Commerce assigned SIW a de

minimis preliminary weighted-average dumping margin of 0.07% *ad valorem*.  *Prelim.*

*Determination*, 78 Fed. Reg. at 75,548.

        Commerce published its Final Determination on May 5, 2014.  *Final Determination*,

79 Fed. Reg. at 25,574.  Commerce released an accompanying Issues and Decision

Memorandum.  *Issues and Decision Mem. for the Antidumping Duty Investigation of Prestressed*

*Concrete Steel Rail Tie Wire from Thailand*, A-549-829 (Apr. 28, 2014), (P.R. Doc. 175),

*available at* http://enforcement.trade.gov/frn/summary/thailand/2014-10237-1.pdf (last visited

June 23, 2016) ("*Final Decision Mem.*").  Using SIW's third-country POI sales to South Africa,

rather than constructed value, as the basis for determining normal value, Commerce assigned

---

        [3] Unless otherwise stated, all statutory citations are to the 2012 edition of the U.S. Code, and all citations to agency regulations are to the 2012 edition of the Code of Federal Regulations.

        [4] *See* 19 U.S.C. § 1677b(e) (describing constructed value as the sum of the cost of materials and processing employed in producing the subject merchandise, the selling, general, and administrative expenses, and profit).

SIW a final margin of 0.00% and concluded the investigation.[5]  *Final Determination*, 79 Fed.

Reg. at 25,575 ("As our final determination is negative, this proceeding is terminated.").

B.  Litigation before the Court of International Trade

Plaintiffs initiated this action by filing a summons on June 3, 2014 and a complaint on

June 26, 2014.  Summons, ECF No. 1; Compl. ¶ 1.  Plaintiffs filed their motion for judgment on

the agency record and accompanying brief on October 17, 2014.  Pls.' Mot. 1; Br. in Support of

Pls.' Rule 56.2 Mot. for J. on Agency R., ECF No. 26 (public), ECF No. 24 (conf.) ("Pls.' Br.").

On January 16, 2015, defendant and defendant-intervenor each filed responses opposing

plaintiffs' motion.  Def.'s Resp.; Resp. of Def.-Intervenor in Opp'n to Mot. for Rule 56.2 J. on

the Agency R. (Jan. 16, 2015), ECF No. 32 (public), ECF No. 31 (conf.) ("Def.-Intervenor's

Resp.").  Plaintiffs filed their reply on February 17, 2015.  Pls.' Reply Br., ECF No. 38 (public),

ECF No. 37 (conf.) ("Pls.' Reply").

II. DISCUSSION

A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court may review a negative final determination

of sales at less than fair value in an action brought under section 516A(a)(2) of the Tariff Act

of 1930 ("Tariff Act"); *see* 19 U.S.C. § 1516a(a)(2)(A), (a)(2)(B)(ii).  Upon judicial review, the

---

[5] Under Sections 773 and 775 of the Tariff Act of 1930, a weighted-average dumping margin determined in an antidumping duty investigation is de minimis, and therefore disregarded, if it is less than 2% *ad valorem*.  19 U.S.C. § 1673d(a)(4) (In making a final determination in a less-than-fair-value investigation, Commerce "shall disregard any weighted average dumping margin that is de minimis as defined in section 1673b(b)(3) of this title."); *id.* § 1673b(b)(3) (For a preliminary less-than-fair-value determination, "a weighted average dumping margin is de minimis if the administering authority determines that it is *less than 2 percent ad valorem . . . .*" (emphases added)).

court will hold unlawful any finding, conclusion, or determination not supported by substantial

record evidence or otherwise not in accordance with law.  *Id.* § 1516a(b)(1)(B)(i).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### B.  The Department's Selection of South Africa as the Comparison Market

Plaintiffs challenge the Department's decision in the Final Determination to base normal

value on SIW's sales to South Africa during the POI.  Pls.' Br. 17-29.  Plaintiffs argue that

Commerce instead should have determined normal value on a constructed value basis.  *See*, *e.g.*,

*id.* at 2-3; Pls.' Reply 13, 21.

Section 773(a)(1)(B)(i) of the Tariff Act identifies normal value ("NV") as, ordinarily, the

price at which the foreign like product is first sold for consumption in the exporting country (the

"home market").  19 U.S.C. § 1677b(a)(1)(B)(i).  In the absence of a viable home market, i.e., a

market with sufficient sales of the foreign like product during the relevant period, Commerce

may calculate normal value using the price at which the foreign like product is sold "for

consumption in a country other than the exporting country or the United States" (a "third

country" comparison market), provided certain conditions are met.  *Id.* § 1677b(a)(1)(B)–

(a)(1)(C).  Among those conditions are that "such price is representative," *id.*

§ 1677b(a)(1)(B)(ii)(I), and that Commerce "does not determine that the particular market

situation in such other country prevents a proper comparison with the export price or constructed

export price," *id.* § 1677b(a)(1)(B)(ii)(III).  If these conditions are not met, Commerce may

determine normal value on the basis of constructed value.  *Id.* § 1677b(a)(4).

During the preliminary phase of the investigation, Commerce found that "the wire

product that SIW sold in Thailand did not meet at least one of the requirements specified in the

ASTM [American Society of Testing Materials specification A881/A881M] standard" and so

found that "SIW's wire product sold in Thailand was not a 'foreign like product' within the

meaning of section 771(16) of the [Tariff] Act and could not be used as a basis for NV."  *Prelim.*

*Decision Mem.* 7.  During the investigation, the petitioners alleged that, according to SIW's

third-country sales data, "a 'particular market situation' exists which renders sales to South

Africa inappropriate as a basis for NV."  *Id.*  Explaining that the petitioners' allegation "raises

questions as to whether SIW's sales to South Africa are suitable as a basis for NV," and that it

lacked "sufficient time to analyze the matter," Commerce preliminarily based normal value on

constructed value.  *Id.* at 8; *see* 19 U.S.C. § 1677b(a)(4).  As to plaintiffs' allegation of a

"particular market situation," Commerce explained, further, that it intended to request

"additional information from SIW with respect to this issue" and would "verify this information

and consider it for purposes of the final determination."  *Prelim. Decision Mem.* 8.  SIW

submitted its responses to the Department's request for additional information on December 30,

2013.  *See, e.g.*, *Response of the Siam Industrial Wire Co, Ltd. to the Dept. of Commerce's First*

*Suppl. Section D Antidumping Questionnaire* (P.R. Docs. 136-141) (C.R. Docs. 116-134).  In the

Final Determination, Commerce rejected petitioners' allegation of a particular market situation

and determined normal value based on SIW's sales in the South Africa market.  *Final Decision*

*Mem.* 3, 18.

        Plaintiffs claim that Commerce was required to find, in accordance with section

773(a)(1)(B)(ii)(III), that "the 'particular market situation' in South Africa prevented a 'proper'

price comparison" with constructed export price.  Pls.' Br. 20; *see* 19 U.S.C.

§ 1677b(a)(1)(B)(ii)(III).  Plaintiffs claim, further, that use of SIW's South Africa sales was

unlawful because the prices in those sales were not "representative" as required by section

773(a)(1)(B)(ii)(I) of the Tariff Act.  Pls.' Br. 22, 29; *see* 19 U.S.C. § 1677b(a)(1)(B)(ii)(I).  For

the following reasons, the court concludes that plaintiffs cannot prevail on either of these claims.

> 1.  Commerce Permissibly Declined to Find a "Particular Market Situation" in South Africa in Response to Plaintiffs' "Rejected Merchandise" Argument

Rejecting plaintiffs' allegation, Commerce found in the Final Determination that there was

not a "particular market situation" in South Africa that would prevent a proper comparison with

SIW's U.S. sales.  *Final Decision Mem.* 18.  The term "particular market situation" is not defined

by the statute, the Statement of Administrative Action accompanying the Uruguay Round

Agreements Act ("SAA"), the Department's regulations, or the Preamble accompanying

promulgation of the Department's regulations.  *See* 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III),

(a)(1)(C)(iii); *Uruguay Round Agreements Act Statement of Administrative Action*, H.R. Doc.

No. 103-316, 656, 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 ("*SAA*"); 19 C.F.R.

§ 351.404(c)(2)(i); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (preamble

to the Department's regulations promulgating 19 C.F.R. § 351.404).  Accordingly, Commerce

must be afforded considerable discretion to determine, case-by-case, whether or not a particular

market situation in a third country prevents a proper comparison with U.S. price.

Although it does not define the term, the SAA provides examples of what may constitute a

"particular market situation" that would prevent proper comparison with U.S. price, namely:

(1) where a single sale in the comparison market constitutes five percent of sales to the United

States; (2) there is government control over prices to such extent that comparison market prices

"cannot be considered to be competitively set," or (3) there are differing patterns of demand experienced in the U.S. and in the comparison market country.[6]  *SAA* at 822.

Plaintiffs argue that, based on the Department's administrative precedent, a "particular market situation" exists where there are "sales to third countries of leftover merchandise from the U.S. market . . . ."  Pls.' Br 18 (citing *Notice of Preliminary Results of New Shipper Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Ecuador*, 71 Fed. Reg. 34,888, 34,890 (Int'l Trade Admin. June 16, 2006); *Notice of Final Results of New Shipper Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Ecuador*, 71 Fed. Reg. 54,977 (Int'l Trade Admin. Sept. 20, 2006)).  Plaintiffs argue that the sales in South Africa were of merchandise "rejected" by SIW's U.S. customer and that this fact "should have led to a 'particular market situation' finding by Commerce and a refusal to rely on South African sales as the basis of normal value."  *Id.* at 19-20.

Plaintiffs' argument is unconvincing on this record.  Commerce found that the merchandise sold in South Africa "was neither defective, nor non-prime," *Further Discussion of Comment 2 in the Issues and Decision Mem.* at 3 (Apr. 28, 2014), (C.R. Doc. 329) ("*Further Discussion of Comment 2*"), and substantial evidence supports this finding.  Commerce found, consistent with the record evidence, that all of the merchandise SIW sold in South Africa met the ASTM A-881 standard, a finding plaintiffs do not contest.  Alluding to "rejection" by the U.S. customer, CXT, plaintiffs characterize this merchandise as "downgraded to a lower specification (A881)."  Pls.' Br. 20-22.  Through this characterization, plaintiffs submit that the merchandise

---

[6] The SAA lists these examples in the context of consideration of a home market. However, a reading of this section of the SAA together with the following section on third-country sales supports an inference that these examples apply when assessing comparison market viability in either a home market or third-country market context.

in the South Africa sales was inferior in a way that had implications for sales price and that

thereby prevented a valid comparison with U.S. price.  *See id.* at 22 ("Certainly, CXT would

have been unwilling to pay the same price for rejected, downgraded material as it paid for

material meeting its proprietary standard.  *Indeed, it refused to pay for rejected material at all.*"

(emphasis in original)).

The court is unable to find on the record any evidence that the PC tie wire SIW sold in the

South Africa market is regarded in the industry or in commerce as being of a lower or inferior

grade when viewed according to some generally-accepted standard, and plaintiffs do not direct

the court to any such evidence.  In the investigation, Commerce found that "[a]ll of the

merchandise sold to South Africa during the POI met the ASTM A-881 standard and production

requirements of the scope of this investigation" and also found that "SIW's U.S. customer

requires that its merchandise meet certain additional specifications beyond the ASTM A-881

standard." *Further Discussion of Comment 2* at 3.

In the investigation, Commerce found the ASTM A-881 specification to be a generally-

recognized industrial specification applying to PC tie wire, relying on it to define the scope of

the investigation, and plaintiffs do not take issue with this finding.  Plaintiffs, however, did not

identify a second, higher specification that is recognized in commerce or in the industry as

superior to ASTM A-881.  As plaintiffs' own discussion of the issue concedes, CXT's additional

specifications are "proprietary" specifications for that company's own purchases; Commerce was

presented with no record evidence that these additional specifications were based on commercial

or industry standards that have gained general acceptance.  Therefore, plaintiffs' characterization

of the merchandise SIW sold in South Africa as "downgraded to a lower specification (A881)"

cannot be supported on this record.  Viewed in light of the discretion Commerce may exercise,

the finding that a U.S. customer purchased PC tie wire only according to these additional

specifications was insufficient to require Commerce to conclude that a particular market situation

in South Africa prevented a valid price comparison.

<u>2.  Plaintiffs Failed to Exhaust their Administrative Remedies on their Argument that the South
Africa and U.S. Markets Were Characterized by Different Terms of Sale</u>

Plaintiffs argue that a "particular market situation" should have been found to exist

because the terms of SIW's sales in South Africa differed from the terms of its sales to the United

States.  According to plaintiffs, Commerce was required to consider the different terms of sale

here because "[t]he misalignment of sales terms between markets is one of the principal

considerations undertaken by Commerce in every case in which it analyzes a 'particular market

situation.'"  Pls.' Br. 27 (emphasis omitted).

In reviewing an agency determination, the court is directed to "where appropriate, require

the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The Supreme Court has

instructed that "[s]imple fairness to those who are engaged in the tasks of administration, and to

litigants, requires as a general rule that courts should not topple over administrative decisions

unless the administrative body not only has erred but has erred *against objection made at the*

*time appropriate under its practice*."  *United States v. L.A. Tucker Truck Lines, Inc.*,

344 U.S. 33, 37 (1952) (emphasis added) ("*L.A. Tucker Truck Lines*"); *see also Richey v. United*

*States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) ("*Richey*") (holding that the requirement of

exhausting administrative remedies serves "the twin purposes . . . of protecting administrative

agency authority and promoting judicial efficiency." (citation omitted)).  Commerce has

provided in its regulations that the "case brief" filed with the agency during an investigation

"must present all arguments that continue in the submitter's view to be relevant to the Secretary's

final determination . . . , including any arguments presented before the date of publication of the

preliminary determination . . . ."  19 C.F.R. § 351.309(c)(2).

Plaintiffs did not raise their "terms of sale" argument in either their "particular market

situation" allegation or their administrative case brief before Commerce.  Although basing

normal value on constructed value in the Preliminary Determination, Commerce indicated that

this was not a final decision and that in the final phase of the investigation it would revisit the

issue of whether to base normal value on the third-country market of South Africa.  *See Prelim.*

*Decision Mem.* 8.  Commerce announced, specifically, that it would request additional

information from SIW and consider the allegation of a particular market situation for the final

determination.  *Id*.  Plaintiffs, therefore, were on notice at the time they filed their administrative

case brief that Commerce would reconsider the issue of whether to base normal value on SIW's

South Africa sales.  Furthermore, SIW responded to the Department's request for additional

information before plaintiffs filed their administrative case brief.  *See, e.g.*, *Petitioners' Case Br.*

(Mar. 21, 2014), (P.R. Doc. 162) (C.R. Doc. 321).  If plaintiffs believed the different sales terms

brought about a particular market situation in South Africa that prevented a valid price

comparison, then plaintiffs had an obligation to raise that argument before Commerce in their

administrative case brief so that Commerce could decide the issue in the first instance.  The

court, therefore, declines to consider on the merits plaintiffs' argument on terms of sale.

3.  Plaintiffs Failed to Exhaust their Administrative Remedies on their Claim that SIW's South
     Africa Sales Were Not "Representative" under 19 U.S.C. § 1677b(a)(1)(B)(ii)(I)

In addition to their "particular market situation" claim, plaintiffs claim that the prices for

the South Africa sales were not "representative" and therefore could not be used for determining

normal value.  *See* Pls.' Br. 22, 29; 19 U.S.C. § 1677b(a)(1)(B)(ii)(I).  Plaintiffs argue that the

court must remand the Final Determination on this issue because Commerce failed to address

their argument during the investigation.  *See* Pls.' Br. 28-29.  Here also, the court concludes that

plaintiffs failed to exhaust their administrative remedies.

In their case brief before Commerce, plaintiffs, as petitioners, stated that the price at

which SIW sold PC tie wire in South Africa "was neither normal nor representative."

*Petitioners' Case Br.* 42.  However, they stated this argument solely in the context of their claim

that Commerce should have found the existence of a particular market situation in the third-

country market of South Africa.  The statutory requirement of 19 U.S.C. § 1677b(a)(1)(B)(ii)(III)

that the particular market situation not prevent a proper comparison with the export price or

constructed export price is distinct from the statutory requirement of 19 U.S.C.

§ 1677b(a)(1)(B)(ii)(I) that the price be "representative," a statutory requirement plaintiffs' case

brief did not address specifically.  To further the statutory directive that exhaustion of

administrative remedies be required where appropriate, the court does not consider the merits of

the argument plaintiffs ground in § 1677b(a)(1)(B)(ii)(I).

C.  The Department's Exclusion of Certain Wire Rod Inputs from SIW's Cost of Production

When basing normal value on sales in a viable comparison market (i.e., home market or

third country market), Commerce in certain circumstances may disregard sales made at prices

below the cost of production.  19 U.S.C. § 1677b(b)(1).  Section 773(b) of the Tariff Act directs

Commerce, when determining cost of production for this purpose, to include in its calculation of

the cost of production "the cost of materials . . . employed in producing the foreign like

product . . . ."  *Id.* § 1677b(b)(3)(A).  In determining SIW's cost of production for the POI,

Commerce included a weighted-average calculation of the cost of "Grade 82b" high carbon steel

wire rod—the primary input material SIW used in producing PC tie wire for the South Africa and

U.S. markets.  *See Prelim. Determination Mem.* 4; *Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Siam Industrial Wire Co., Ltd*., at 1 (Apr. 28, 2014), (P.R. Doc. 174) (C.R. Doc. 328).

Plaintiffs allege two errors in the Department's calculation of the cost of the Grade 82b wire rod input.  First, plaintiffs allege that Commerce, when averaging the cost of this input over the POI, erroneously included only the wire rod from the inventory of SIW's "PC Wire" division, which produced PC tie wire, and failed to include in the average the cost of Grade 82b wire rod from the inventory of SIW's "PC Strand" Division, which produced prestressed concrete steel reinforcing bar.  Pls.' Br. 14-17.  According to plaintiffs, the record shows that wire rod inventory from the PC Strand Division was used at times to produce PC tie wire.  *Id.* at 15 (citing *Verification of the Cost Response of Siam Industrial Wire Co., Ltd.*, at Ex. CVE-7, 44-45 (Mar. 10, 2014), (P.R. Doc. 154) (C.R. Doc. 320) ("*Cost Verification Report*")).  Below, the court addresses defendant's request that the court remand the Final Determination with respect to this issue and the court's reasoning in granting the request.

Second, plaintiffs allege that Commerce erred in confining its average to Grade 82b wire rod that was of 13 mm diameter and also should have included Grade 82b wire rod of 11 mm diameter, asserting that SIW admitted that it used this type of wire rod in its production of PC tie wire.  Pls.' Br. 13-14.  As also discussed below, the court denies relief on plaintiffs' claim pertaining to 11 mm wire rod.

<u>1.  The Court Remands the Final Determination to Allow Commerce to Reconsider Its Calculation of the Weighted-Average Cost of the 13 mm Wire Rod</u>

Defendant's request is that the court remand the Final Determination to allow Commerce to reconsider "the cost of production issue relative to 13 mm diameter Grade 82B from SIW's PC

Strand Division."  Def.'s Resp. 10.  Under this request, Commerce would not reconsider its

decision to base SIW's wire rod cost solely on costs for wire rod of 13 mm diameter.  *Id.*

at 10-11.  Plaintiffs support defendant's request but urge the court also to remand the Final

Determination on the issue they raise as to 11 mm wire rod.  Pls.' Reply 1-2.  Defendant-

intervenor takes the position that "limiting the analysis to the PC Wire Division has no impact

whatsoever on the cost of the subject merchandise."  Def.-Intervenor's Resp. 10.

A court ordinarily will grant a request that a decision be remanded to the agency that

made the decision if "the agency's concern is substantial and legitimate."  *See SKF USA Inc. v.*

*United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  Citing record evidence, plaintiffs have

raised a substantial and legitimate question as to whether Commerce correctly excluded wire rod

input obtained from the PC Strand Division, a question Commerce has indicated it wants to

reconsider.  Defendant's request, therefore, is meritorious, and the court will grant it.  In granting

the request, the court reaches no position on whether including wire rod from the PC Strand

Division's inventory will affect the weighted-average dumping duty margin.

2.  Commerce Permissibly Determined that 11 mm Wire Rod Was Not Used in the Production of
PC Tie Wire that Was the Subject of the Investigation

According to plaintiffs, "[t]he record facts demonstrate that SIW could and did use Grade

82B 11 mm wire rod in the production of PC tie wire."  Pls.' Br. 13.  Plaintiffs argue, specifically,

that SIW "acknowledged to Commerce that SIW also uses 11 mm wire rod for some of its

production of subject PC tie wire in addition to 13 mm wire rod."  *Id.* at 13-14 (citing *Corrected*

*Comment of Respondent SIW on Product Matching Elements* (June 11, 2013), (P.R. Doc. 30)

(quotations omitted)).  In the Final Determination, Commerce concluded that, contrary to the

position taken by plaintiffs, SIW did not use 11 mm wire rod in producing the PC tie wire sold

during the POI in the United States and in South Africa, the Department's chosen comparison

market. *Final Decision Mem.* 25.

      Record evidence supports a finding that SIW did not use 11 mm wire rod to produce PC

tie wire that was the subject of the investigation.  SIW included with its section D questionnaire

response detailed wire rod input data showing the actual wire rod consumption as 13 mm 82B

wire rod for each of the two products sold in the U.S. and South Africa markets, described as

SIW's CONNUM 332 and its CONNUM 232.  *Resp. of the Siam Industrial Wire Co., Ltd. to the*

*Dep't of Commerce's Antidumping Questionnaire Section D*, Ex. D-12 at 5 (Nov. 19, 2013), (P.R.

Doc. 104) (C.R. Doc. 88) ("*Section D Questionnaire Resp.*"); *see* Def.-Intervenor's Resp. 7.

Commerce verified these data.  *Cost Verification Report* at 3.  Plaintiffs fail to identify any

relevant record evidence indicating that SIW used 11 mm wire rod to produce PC tie wire

imported into the United States or sold in the comparison market.  Plaintiffs' reliance on the

product-matching comments that SIW provided to Commerce, in which SIW referenced the use

of 11 mm wire rod for some of its production of PC tie wire, is misplaced.  Subsequent to this

submission, Commerce narrowed the scope of the investigation (at petitioners' request) to

include only PC tie wire from Thailand meeting ASTM specification A-881, which left only

merchandise in CONNUMs 332 and 232 subject to the investigation.  *See Letter from Sec'y to*

*Haynes and Boone on Home Market Reporting* (Oct. 28, 2013), (P.R. Doc. 86).

      In their reply brief, plaintiffs make the unavailing argument that "the relevant inquiry is

to determine the cost of the raw material held in inventory by SIW that *could have been* used to

produce the subject merchandise, not simply the cost of the raw material the respondent selects

or assigns to the production of the subject merchandise."  Pls.' Reply 4 (emphasis in original).

Plaintiffs offer no convincing reason why Commerce was required to broaden its COP

calculation in the way plaintiffs advocate.  Nor does the court discern any such reason in the

statute.  *See* 19 U.S.C. § 1677b(b)(3)(A) (providing that COP includes the cost of materials

"*employed in producing* the foreign like product" (emphasis added)).

### D.  The Department's Determination of SIW's G&A Expense Ratio

In addition to the cost of materials used in producing the foreign like product, Commerce

is required by section 773(b) of the Tariff Act to include in its calculation of COP "an amount for

selling, general, and administrative expenses based on actual data pertaining to production and

sales of the foreign like product by the exporter in question."  19 U.S.C. § 1677b(b)(3)(B).

Accordingly, Commerce directed SIW to include a G&A expense ratio in its cost data

submission, specifically requesting that SIW "[c]ompute G&A expenses on an annual basis as a

ratio of total company-wide G&A expenses divided by cost of goods sold (COGS)."  *Section D*

*Questionnaire Resp*. at 31.  Commerce also instructed SIW to "[i]nclude in your reported G&A

expenses an amount for administrative services performed on your company's behalf by its

parent company or other affiliated party."  *Id.*

In the Preliminary Determination, Commerce calculated a G&A ratio based on SIW's

submitted cost data, which remained unchanged in the Final Determination.  *Final Decision*

*Mem.* 30; *see Section D Questionnaire Resp*., Exs. D-15, D-17; *Cost Verification Report*,

Ex. CVE-9.  Objecting to the Department's ratio, petitioners argued in their administrative case

brief that "SIW failed to report G&A expenses incurred by its parent company, Tata Steel" in its

cost response, "despite the active control by Tata over SIW's accounting operations."

*Petitioners' Case Br.* 41 (citing *Cost Verification Report* at 15-19).  In their memorandum

accompanying the Final Determination, Commerce found that it did not need to adjust SIW's

G&A ratio because "[t]he record clearly states . . . that Tata Steel provided IT [i.e., information

technology] services to SIW during the POI," and that "SIW paid for these services and such payments are included in the reported costs." *Final Decision Mem.* 30 (citing *Section D Questionnaire Resp.* at 5; *Cost Verification Report* at 21, 37). Commerce concluded that "[b]ecause the costs incurred by Tata Steel on behalf of SIW have already been included in the reported costs, we find it unnecessary to adjust SIW's G&A expense ratio." *Id.*

Before the court, plaintiffs claim that the Department's final G&A calculation is not supported by substantial evidence because SIW's reported G&A expense ratio, on which Commerce relied for its calculation, failed to account for G&A expenses incurred by Tata Steel on SIW's behalf. Pls.' Br. 5 ("SIW reported only its own general and administrative costs, and never included an amount for G&A costs incurred by Tata Steel on SIW's behalf . . . ."). Plaintiffs bring their claim on two grounds. First, plaintiffs argue that SIW received certain inspection and selling services from Tata Steel in conjunction with SIW's U.S. sales to CXT, and that there is no record evidence that these services were included in SIW's G&A ratio. *Id.* at 30-32. Second, plaintiffs argue, in essence, that record evidence does not support the Department's finding that the value of IT services provided to SIW by Tata Steel are reflected in the G&A ratio. *Id.* at 32-34. Plaintiffs propose that to "accurately capture G&A expenses," Commerce "should have added G&A expenses for Tata Steel," which plaintiffs calculate at 8.92% "based on Tata Steel's most recent financial statements" to the G&A expenses reported by SIW. *Id.* at 34.

Plaintiffs' first ground is precluded by the exhaustion doctrine. According to plaintiffs, Tata Steel "coordinates the purchase and sale of PC tie wire between SIW and CXT and handles the administrative and other costs associated with shipping and testing coils, as well as handling rejected coils, among the parties." Pls.' Br. 32. Plaintiffs cite the testimony of a "sales manager

for Tata Steel International (Americas), Mr. Bhandari," who testified before the U.S.

International Trade Commission that "Tata Steel sent '16 samples' from each PC tie wire coil to

the U.S. customer CXT, that CXT either then accepts or 'rejects those coils,' that CXT

'regularly' rejects SIW coils, that CXT maintains stricter specifications for PC tie wire, and that

Tata Steel uses the same wire rod (raw material) to produce PC tie wire for CXT as for other

customers." *Id*. at 31-32 (citing *Petitioners' Comments on Product Characteristics and Product*

*Matching Hierarchy*, Attach. 2, at 111-112 (June 3, 2013), (P.R. Doc. 26) (C.R. Doc. 16);

*Petitioners' Comments on Scope*, Attach. 3, at 120-122 (June 3, 2013), (P.R. Doc. 27) (C.R.

Doc. 17)).  Plaintiffs argue that these services were not accounted for in the cost data SIW

submitted to Commerce.  *Id*.  The court declines to consider plaintiffs' argument on the merits

because plaintiffs did not raise the argument in their administrative case brief before Commerce.

*See* 28 U.S.C. § 2637(d) (directing the court to "where appropriate, require the exhaustion of

administrative remedies"); 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments

that continue in the submitter's view to be relevant to . . . the final determination . . . ."); *see also*

*L.A. Tucker Truck Lines*, 344 U.S. at 37; *Richey*, 322 F.3d at 1326.  Perhaps because it was not

raised in the case brief, Commerce did not address this argument in the Final Determination or

the accompanying Issues & Decision Memorandum.

  Plaintiffs contend that their administrative case brief "sufficiently raised the issue of

Tata's involvement in SIW's operations for purposes of the exhaustion doctrine."  Pls.' Reply 18.

In support of this contention, plaintiffs cite the following language from their case brief:

> In its cost response, SIW failed to report G&A expenses incurred by its parent
> company, Tata Steel, despite the active control by Tata over SIW's accounting
> operations.  Tata's active involvement *in SIW's operations*, particularly in the
> management of SIW's accounting system, was apparent at the cost verification.

*Id.* at 17-18 (quoting *Petitioners' Case Br.* at 41) (emphasis added in Pls.' Reply).  The only specific costs identified in this paragraph relate to accounting operations, and the only other reference is to operations generally, not shipping or inspection of merchandise for sale to the U.S. customer, CXT.  The generalized reference to "Tata's active involvement in SIW's operations" did not communicate to Commerce the allegation that Tata Steel provided shipping and product inspection services to SIW that were not accounted for in SIW's cost data. Accordingly, Commerce did not have the opportunity during the investigation to address plaintiffs' specific argument, which plaintiffs may not raise for the first time before the court.

　　　　The court concludes that the Final Determination should be remanded on plaintiffs' second ground.  The court is unable to identify on the record substantial evidence to support the Department's finding that the value of IT services Tata Steel reportedly provided to SIW was reflected in the G&A ratio.  In its Section D Questionnaire Response, SIW stated that it purchased IT services from Tata Steel and was invoiced monthly for those services.  *See Section D Questionnaire Resp.* at 5; *see also Final Decision Mem.* 30.  In the Final Determination, Commerce found that "the record shows that SIW paid for these services and such payments are included in the reported costs."  *Final Decision Mem.* 30.  The court is unable to conclude that this finding is supported by substantial evidence on the record.

　　　　As support for its finding, Commerce cited in the Final Decision Memorandum two pages in a document it prepared following verification (the "Cost Verification Report").  *Id.* at 30 n.139 (citing *Cost Verification Report* at 21, 37).  The Department's first citation, to page 21 of the Cost Verification Report, includes a table with a line item for "Administrative Expenses" but makes no reference to IT expenses, IT services, or Tata Steel.  *Cost Verification Report* at 21.  The Cost Verification Report cited several sources for the data included in the table, but these sources do

not provide clarification relevant to the issue presented. *See id.* (citing *Resp. of the Siam Industrial Wire Co., Ltd. to the Dep't of Commerce's Antidumping Questionnaire Section A*, Ex. A-12 at 6 (July 16, 2013), (P.R. Doc. 42) (C.R. Doc. 19); *Section D Questionnaire Resp.*, Ex. D-17 at 1-2; *Cost Verification Report*, Ex. CVE-7 at 1-2).

The second citation in the Final Decision Memorandum is to page 37 of the Cost Verification Report. *Final Decision Mem.* at 30 n.139. But like page 21 of the Cost Verification Report, page 37 lacks any reference to IT services, IT expenses, or Tata Steel. One of the exhibits to the Cost Verification Report cited on page 37 contains a table, identified as "Cost Center Detail – General Expenses," that itemizes certain general expenses grouped under the heading "IT Unit." *Cost Verification Report*, Ex. CVE-9 at 4. Defendant-intervenor argues that this chart "provides the detailed support for the total amount of G&A expenses reported in SIW's audited financial statement, which was used as the basis for the reported G&A ratio." Def.-Intervenor's Resp. 19 (citing *Cost Verification Report*, Ex. CVE-9 at 4). The table itemizes the "IT Unit" expenses under more specific categories, two of which are arguably relevant here. One of them, however, is designated "General Expenses – Others," a title too general to support a conclusion as to the particular IT services at issue, and the amount presented is sufficiently small as to cast some doubt as to whether the value of those services could be contained therein. Another cost category, "Other Repairs and Maintenance," is larger, but nothing in the record supports a conclusion that the IT services provided by Tata Steel were for maintenance and repair of IT equipment.

In summary, there are unresolved questions on this record as to whether, as Commerce found, the G&A ratio includes the value of the IT services Tata Steel is said to have provided to

SIW.  The court, therefore, remands the Final Determination to Commerce for reconsideration of this issue and for modification or explanation, as appropriate.

### III. CONCLUSION AND ORDER

For the foregoing reasons, the court affirms in part, and remands in part, the Final Determination.  Upon consideration of the Final Determination and all submissions made herein, and upon due deliberation, it is hereby

**ORDERED** that defendant's request that the Final Determination be remanded as to the issue of wire rod obtained from the PC Strand Division be, and hereby is, granted; it is further

**ORDERED** that Commerce shall reconsider its determination of SIW's cost of production as it relates to 13 mm diameter Grade 82B wire rod and the inventory of SIW's PC Strand Division; it is further

**ORDERED** that Commerce shall reconsider its calculation of SIW's G&A ratio to determine whether the ratio properly captures the value of IT services provided by Tata Steel and take any necessary corrective action; it is further

**ORDERED** that Commerce shall submit a redetermination in compliance with this Opinion and Order within 90 days of the date of the issuance of this Opinion and Order; it is further

**ORDERED** that plaintiffs and defendant-intervenor may submit comments to the court on the Department's redetermination within 30 days of the filing of the redetermination with the court; and it is further

**ORDERED** that defendant may file a response to comments within 15 days of the filing of the last comment submission.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  June 28, 2016
New York, New York